# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MTB ENTERPRISES, INC., a Utah corporation and MICHAEL T. BILANZICH, an individual and HAIRWARE USA, INC., a Utah corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>ADC VENTURE 2011-2, LLC, a Delaware limited liability company, as successor to ANB Financial, N.A. and the Federal Deposit Insurance Corporation,<br><br>Defendant. | Case No.  1:12-cv-00331-S-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

Before the Court in the above entitled matter is the Defendant's Motion to Dismiss pursuant to Rule 12(b)(6). The parties have filed their responsive briefing and the matter is ripe for the Court's review. Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the Motion shall be decided on the record before this Court without oral argument.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs MTB Enterprises, Inc. ("MTB"), Michael T. Bilanzich, and Hairwire USA, Inc. (collectively "Plaintiffs"), brought this diversity action against Defendant ADC Venture 2011-2, LLC ("ADC") raising claims for breach of contract, reformation, declaratory judgment, injunctive relief, and successor liability. (Dkt. 1.) The claims relate

MEMORANDUM DECISION AND ORDER- 1

to a series of agreements entered into between MTB and an entity called ANB Financial, N.A. ("ANB") on September 24, 2007. At that time, those parties entered into the Construction Loan Agreement whereby ANB agreed to loan up to Seventeen Million Dollars to MTB to develop property in Kuna, Idaho. (Dkt. 1.) The terms of the agreement called for the execution of a Line of Credit Agreement which provided that the loan would be disbursed to MTB in the form of a line-of-credit over time and that the entire amount of the loan was obligatory such that ANB could not refuse to allow MTB to draw on the line-of-credit up to the maximum amount of the loan absent certain conditions. The loan was due and payable on September 24, 2008. To date, MTB has drawn Eleven Million Dollars out on the loan. Although Six Million Dollars remains available on the loan, MTB alleges it has not been allowed to make further draws on the loan contrary to the terms of the loan agreements. (Dkt. 1.) As a result, MTB alleges it has been unable to continue to develop, improve, and ensure the viability of the real estate development project it has undertaken in Kuna, Idaho. (Dkt. 1.)

On May 9, 2008, prior to the September 2008 due date of the Construction Loan Agreement, the Office of the Comptroller of the Currency ("OCC") closed ANB and the Federal Deposit Insurance Corporation ("FDIC") was appointed as Receiver for ANB. In December of 2011, the FDIC entered into an Asset Contribution Agreement with the Defendant ADC. The Asset Contribution Agreement separated certain of ANB's assets and liabilities. The FDIC retained the liabilities and certain assets were transferred to ADC. (Dkt 13 at Ex. 2.) One of the assets transferred to ADC was the Construction Loan Agreement with MTB.

On June 28, 2012, MTB filed this action against the Defendant ADC alleging that, as ANB's successor, ADC was on notice of the breaches and assumed the obligations of ANB and the FDIC when it purchased the agreements at issue. (Dkt. 1.) ADC has filed the instant Motion to Dismiss arguing it did not assume liability for the conduct of ANB or the FDIC when it purchased certain assets and liabilities from those entities. (Dkt. 13.)

## STANDARD OF LAW

A motion to dismiss made pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a party's claim for relief. When considering such a motion, the Court's inquiry is whether the allegations in a pleading are sufficient under applicable pleading standards. Federal Rule of Civil Procedure 8(a) sets forth minimum pleading rules, requiring only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

A motion to dismiss will only be granted if the complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). Although "we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 1949-50; *see also Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

Therefore, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Caviness v. Horizon Comm. Learning Cent., Inc.*, 590 F.3d 806, 811-12 (9th Cir. 2010) (citation omitted).

## DISCUSSION

**1.      Nature of the Motion**

The parties dispute whether this Motion is properly considered as one under Rule 12(b)(6) or if it should be converted to a Motion for Summary Judgement under Rule 56. In ruling on the Motion, ADC argues, the Court can and should take judicial notice of 1) documents held on the FDIC's public website, 2) orders and filings in other state and federal courts, and 3) the contract documents extensively referenced by MTB. (Dkt. 13 at 2.) MTB counters that ADC effectively seeks summary judgment in this Motion which is premature given that no discovery has yet taken place and there are genuine issues of material fact as to the meaning and intent of the parties' in the agreements. (Dkt. 16 at 3-4, 10.)

Generally, the Court may not consider any material beyond the pleadings in ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994). If materials outside the pleadings are considered, the motion is converted to a motion for summary judgment governed by Federal Rule of Civil Procedure 56. *See Jacobsen v. AEG Capital Corp.*, 50 F.3d 1493, 1496 (9th Cir. 1995). There are, however, times when documents other than the pleadings can be considered without converting a motion to dismiss into a motion for summary judgment. *See Branch*, 14 F.3d at 453. "[D]ocuments whose contents are alleged in a

complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." *Id.*

Here, the Court has reviewed the documents supplied by ADC and finds it appropriate to consider the Asset Contribution Agreement, Line of Credit Agreement, and the Construction Loan Agreement. (Dkt. 13, Ex. 2, 11, 12.) Neither party appears to dispute the authenticity of the documents and both parties have referred to and relied upon these documents in arguing their positions on the Motion to Dismiss. (Dkt. 13, 16, 17); *see also Branch*, 14 F.3d at 453. Accordingly, the Court will consider the same in deciding this Motion.

As to the documents found on the FDIC public website, Federal Rule of Evidence 201 allows for the Court to take judicial notice of a fact that is not subject to reasonable dispute where, as here, the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The Agreement of Definitions, Asset Contribution Agreement, Amended and Restated LLC Operating Agreement, and Private Owner Interest Sale and Assignment Agreement are all found on the FDIC's public website and the authenticity of the documents has not been disputed. (Dkt. 13, Ex. 1, 2, 3, 4); *see Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) and *Allen v. United Financial Mortg. Corp.*, 660 F.Supp.2d 1089, 1093 (N.D. Cal. 2009) (proper to take judicial notice of a purchase and assumption agreement that is a matter of public record when deciding a motion to dismiss). As such, the Court finds it appropriate to consider these documents on this

Motion to Dismiss without requiring that the Motion be converted to one for summary judgment.

Based on the foregoing, Court will consider the Motion as one for dismissal pursuant to Rule 12(b)(6) under the standard of law stated above.

**2.     Successor Liability of ADC**

ADC argues the Complaint fails to assert any basis upon which relief may be granted because ADC is not liable as a successor as MTB has alleged. (Dkt. 13 at 1.) MTB counters that ADC assumed the obligations and liabilities of the FDIC and ANB when it purchased the loan in question. (Dkt. 16 at 6.) The principal point of contention between the parties is the language of the Asset Contribution Agreement and the related documents defining the terms therein.

Both parties point to Section 2.2 of the Asset Contribution Agreement which states:

> Liabilities Assumed by the Company. The Company (i) hereby assumes as of the Cut-Off Date the Obligations, and agrees to perform and pay the Obligations when due and (ii) in addition to and without limitation of clause (i), shall indemnify and hold harmless the Transferor from and against all costs and expenses (including attorneys' fees and litigation and similar costs, and other out-of-pocket expenses, actually incurred in investigating, defending, asserting or preparing the defense of any Action), judgments, awards, fines, amounts paid in settlement or penalties incurred by the Transferor (at any time after the Cut-Off Date) arising out of, resulting from or otherwise in connection with any Assumed Closing Date Asset Litigation. Without limitation of the preceding sentence, the Company shall make such payments to the Transferor as shall be necessary to give effect, as between the Company and the Transferor, to the assumption of the Obligations as of the Cut-Off Date (as if this Agreement had been executed and delivered at, and the "Obligations" determined (for purposes of this sentence) as of, the Cut-Off Date (and the Closing Date and the Cut-Off Date were the same date)), including reimbursing the Transferor for any payments made by the Transferor between the Cut-Off date and the Closing

> Date in respect of the Obligations (as so determined). If there arises any question as to whether a Liability arising or becoming due or payable pursuant to or in accordance with any Transferred Contract was, in accordance with the FDIC Legal Powers legally binding on and valid against the Receiver, the Transferor's determination in this regard shall be conclusive and binding on the Company.

(Dkt. 13-4, Ex. 2 at 8.) As used in this document, "the Company" is ADC and "the Transferor" is the FDIC. The "the Cut-Off Date" is specified as November 4, 2011. The parties' differ in regards to their readings of the definitions and applications of the terms "Obligations" and "Excluded Liability" as is used in the documents.

ADC maintains that the definition of "Obligations" as used in Section 2.2 specifically excludes any "Excluded Liability," which is defined as any claim for damages or other remedies that occurred before the Cut-Off Date. (Dkt. 16 at 1113 and Dkt. 17 at 8-9.) MTB counters that the term "Obligations" and Section 2.9 of the document, when taken together, indicate that ADC has agreed to assume the liabilities of the MTB loan. (Dkt. 16 at 8.) MTB further contends that neither of those sections refer to "Excluded Liabilities" as ADC has argued. (Dkt. 16 at 8.)

The Agreement of Definitions includes the following definition of "Obligations" as it is used in the Asset Contribution Agreement:

> **"Obligations"** means all of the following (in each case, whether existing or accrued (or due, overdue or not due) as of, or incurred, imposed or arising on or after, the Cut-Off Date and/or the Closing Date):
>
> (a)  all Liabilities (including any Liability to make an extension of credit (or other advance)) of the Receiver under any Transferred Contract, in each case to the extent the same are, in accordance with the FDIC Legal Powers (interpreted as set forth in the last sentence of Section 2.2 of the Contribution Agreement), legally binding on and valid against the Receiver;
> ...

MEMORANDUM DECISION AND ORDER- 7

>in each case (for <u>(a)</u> through <u>(d)</u> inclusive) excluding, however, any Excluded Liability (disregarding for this purpose <u>clause (c)</u> of the definition of the term "Excluded Liabilities"). It is understood and agreed that any Liability of any Failed Bank or the Receiver that has been discharged or otherwise extinguished (whether by operation of Law, by settlement or payment (including payment by issuance of a receivership certificate), by contract or otherwise) prior to, on or as of a specified date does not constitute a Liability of the Receiver as of such specified date, <u>provided</u>, for the avoidance of doubt, that this sentence does not limit or qualify, and is subject to, <u>clause (c)</u> of the preceding sentence or the indemnity set forth in <u>clause (ii)</u> of the first sentence of <u>Section 2.2</u> of the Contribution Agreement.

(Dkt. 13-3, Ex. 1 at 36-37.) The Agreement of Definitions then defines "Excluded Liabilities to be:

>**"Excluded Liabilities"** means:
>
>(a)   solely with respect to <u>clause (a)</u> of the definition of the term "Obligations", all Liabilities of any Failed Bank and/or the Receiver under any Transferred Contract for damages or other remedies (at law or in equity), to the extent (and only to the extent) attributable to an act or omission or circumstance that occurred or existed prior to the Cut-Off Date and that constituted a breach by any Failed Bank and/or the receiver under such Transferred Contract, or a tort, willful misconduct, fraud or a violation of Law by any failed Bank and/or the Receiver; <u>provided</u>, <u>however</u>, that, this <u>clause(a)</u> does not exclude from <u>clause (a)</u> of the definition of the term "Obligations" any Liability of the Receiver under any Transferred Contract that is overdue (but solely excludes any Liability of any Failed Bank and/or the Receiver for damages or other remedies (at law or in equity) for any breach of any such Liability occurring prior to the Cut-Off Date);
>...
>(c)   all Liabilities of any Failed Bank or the Receiver as of the Closing Date other than the Obligations.

(Dkt. 13-2, Ex. 1 at 22.)

MEMORANDUM DECISION AND ORDER- 8

The Court has reviewed the plain language of the documents at issue here and finds the language to be unambiguous.[1] Section 2.2 of the Asset Contribution Agreement defines the liabilities assumed by ADC as being those "Obligations" that arose as of the Cut-Off Date. Although MTB is correct that Section 2.2 does not refer to "Excluded Liabilities" (Dkt. 16 at 8), the term is incorporated by virtue of the definition of "Obligations" which is referred to repeatedly in Section 2.2. (Dkt. 13-4, Ex. 2 at 3.) "Obligations" is defined to not include "Excluded Liabilities" which are those liabilities attributable to an act or omission or circumstance that occurred or existed prior to the Cut-Off Date.

Upon this reading, the Court finds ADC did not assume liabilities for acts by either ANB or the FDIC prior to November 4, 2011. The acts giving rise to the claims raised in the Complaint here occurred prior to the November 4, 2011 Cut-Off Date. (Dkt. 1.) The loan at issue commenced on September 24, 2007 and provided that MTB would have one year to access the funds in the form of a line of credit up to Seventeen Million Dollars. (Dkt. 1.) Thus, the acts complained of constituting a breach for failing to fund MTB's draws on the line of credit for a full year had to have occurred before September 24, 2008; prior to the November 4, 2011 Cut-Off Date. Thus, the Court finds that ADC is not a successor to the liabilities as alleged by MTB. Because MTB's claims are based upon the existence of such successor liability, the Court finds the absence of the same

---

[1] The Asset Contribution Agreement in this case is governed by New York law. (Dkt. 13-4, Ex. 2 at ¶ 8.2.) Under New York law, "[a] written agreement that is complete, clear, and unambiguous on its face must be enforced so as to give effect to the meaning of its terms and the reasonable expectations of the parties, and the court should determine the intent of the parties from within the four corners of the contract without looking to extrinsic evidence to create ambiguities." *Kimso Apartments, LLC v. Gandhi*, ___ N.Y.S.2d ___, 104 A.D.3d 742 (N.Y. 2013) (citations omitted).

MEMORANDUM DECISION AND ORDER- 9

necessitates granting the Motion to Dismiss. Furthermore, contrary to MTB's argument, the Court finds further discovery or inquiry into the intent of the parties is not necessary.

ADC argues that MTB does not have standing to bring claims against ADC to enforce its interpretation of the Asset Contribution Agreement. (DKt. 17 at 6.) The Court agrees. In *GECCMC*, the Ninth Circuit determined that the plaintiff there could not seek recovery under the agreement entered into between the FDIC and the failed bank institution because it was not a third party beneficiary. *GECCMC 2005-C1 Plummer Street Office Ltd. Partnership v. JPMorgan Chase Bank, Nat. Ass'n*, 671 F.3d 1027, 1035-36 (9th Cir. 2012) (citations omitted). Disallowing third parties to sue is in line with FIRREA's mandate to "preserve and conserve the assets and property of [the Failed Bank]," 12 U.S.C. § 1821(d)(2)(B)(iv), by not opening the door to suits from any number of third parties who might claim a benefit from the Agreement's terms. *See National Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B.*, 28 F.3d 376, 388 (3d Cir.1994) ("One of the important goals of FIRREA is to enable the receiver to efficiently determine creditors' claims and preserve assets of the failed institution without being burdened by complex and costly litigation."); *see also Astra USA, Inc.*, 131 S.Ct. at 1349 ("Recognizing the [alleged third-party beneficiary's] right to proceed in court could spawn a multitude of dispersed and uncoordinated lawsuits").

Under federal common law, "only a party to a contract or an intended third-party beneficiary may sue to enforce the terms of a contract or obtain an appropriate remedy for breach." *See GECCMC*, 671 F.3d at 1033 (citation omitted). "To prove intended beneficiary status, the third party must show that the contract reflects the express or

implied intention of the parties to the contract to benefit the third party." *Id.* (quotations and citation omitted).

"Demonstrating third-party beneficiary status in the context of a government contract is a comparatively difficult task." *County of Santa Clara*, 588 F.3d at 1244. "Parties that benefit from a government contract are generally assumed to be incidental beneficiaries," rather than intended beneficiaries, and so "may not enforce the contract absent a clear intent to the contrary." *Id.* (citation omitted).

This clear intent standard is not met merely by a contract's "explicit reference to a third party" or even a showing that the contract "operates to the [third parties'] benefit and was entered into with [them] 'in mind.'" *Orff v. United States*, 358 F.3d 1137, 1145, 1147 (9th Cir. 2004). Instead, the Court must examine the "precise language of the contract for a 'clear intent' to rebut the presumption that the [third parties] are merely incidental beneficiaries." *Id.* at 1147 n. 5; *see also Kremen v. Cohen*, 337 F.3d 1024, 1029 (9th Cir. 2003) (explaining that a "more stringent test applies" to government contracts). The Court applies these principles to the contract in this case as follows.

In interpreting the contract terms here, the Court notes that the Asset Contribution Agreement in this case is governed by New York law. (Dkt. 13-4, Ex. 2 at ¶ 8.2.) Under New York law, "[a] written agreement that is complete, clear, and unambiguous on its face must be enforced so as to give effect to the meaning of its terms and the reasonable expectations of the parties, and the court should determine the intent of the parties from within the four corners of the contract without looking to extrinsic evidence to create ambiguities." *Kimso Apartments, LLC v. Gandhi*, ___ N.Y.S.2d ___, 104 A.D.3d 742

(N.Y. 2013) (citations omitted). "Whether a contract is ambiguous is a question of law and extrinsic evidence may not be considered unless the document itself is ambiguous." *Consedine v. Portville Cent. School Dist.*, 907 N.E.2d 684, 689 (N.Y. Ct. App. 2009) (internal quotation marks and citations omitted). Federal law applies the same principles of contract interpretation. *See Pierce Cnty. Hotel Emp. & Restaurant Emp. Health Trust v. Elks Lodge*, 827 F.2d 1324, 1327 (9th Cir. 1987) ("Extrinsic evidence is inadmissible to contradict a clear contract term, but if a term is ambiguous, its interpretation depends on the parties' intent at the time of the contract's execution, in light of earlier negotiations, later conduct, related agreements, and industrywide custom[.]") (internal citations omitted). Again, the Court finds the contract here to be unambiguous.

It is clear from the unambiguous terms of the Asset Contribution Agreement that ADC did not assume any of the liabilities that existed prior to the Cut-Off Date. Thus, the claims in the Complaint against ADC do not state a claim for relief. The relief MTB seeks here may exist against the FDIC as found in 12 U.S.C. § 1821. When the FDIC entered into the receivership for ANB, it succeeded ANB to "all rights, titles, powers, and privileges" of ANB. 12 U.S.C. § 1821(d)(2)(A)(i). As receiver, the FDIC "shall pay all valid obligations of the insured depository institution [ANB]." 12 U.S.C. § 1821(d)(2)(H). Essentially, the FDIC as receiver "stepped into the shoes" of ANB, obtaining the rights "of the insured depository institution" that existed prior to receivership. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) (internal citation omitted). This Court, however, makes no determination concerning any possible relief against the FDIC in this Order.

### 3. Legality of FDIC's Transfer of Assets to ADC

MTB has also challenged that the FDIC cannot "transfer an asset to an entity it owns and escape liabilities that might run with that asset simply because it has executed an agreement between itself and the entity it owns saying that no such liability has been assumed." (Dkt. 16 at 2, 5.) ADC counters that the transaction between it and the FDIC was proper in this case because it was governed by the Financial Institution Reform, Recovery, and Enforcement Act ("FIRREA"), which authorized the FDIC to separate ANB's assets from its liabilities and then transfer those liabilities to another financial institution – namely ADC. (Dkt. 17 at 4.)

The parties both cite to *West Park Assocs. v. Butterfield Sav. & Loan Ass'n*, 60 F.3d 1452, 1459 (9th Cir. 1995) in their briefing. Each side argues the case supports its respective position concerning whether or not the FDIC had the power to separate the assets and liabilities of ANB, retain the liabilities, and then transfer ANB's assets to ADC clear of any liabilities. (Dkt. 13 at 9) (Dkt. 16 at 5) (Dkt. 17 at 4-5.) In *West Park*, the Ninth Circuit upheld an assumption agreement where the FDIC, acting as receiver for a failed bank, transferred all liabilities except for any claims by the failed bank's shareholders. *Id.* at 1458. In rejecting the shareholders' claims against the assuming bank, the Ninth Circuit held that a finding in favor of the shareholders would undermine the statutory power of the FDIC. *Id.* at 1459. Using this reasoning here, this Court concludes that the Agreement between FDIC and ADC in this case is valid and enforceable.

"Congress enacted FIRREA in response to the savings and loan crisis of the late 1980s. FIRREA provides for the prompt and efficient resolution of the assets and

MEMORANDUM DECISION AND ORDER- 13

liabilities of failed banks. Under FIRREA, all assets of the failed bank are transferred to the FDIC as receiver. The FDIC has extensive power and discretion to manage the affairs of the failed bank, including the authority to repudiate any contract or lease that it deems burdensome and an impediment to the orderly administration of the failed bank's business." *GECCMC*, 671 F.3d at 1030 (citations omitted); *see also* 12 U.S.C. § 1821(e)(1)(B), (C) (FIRREA providing giving the FDIC the authority to "disaffirm or repudiate any contract or lease.... (B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and (C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs."); and 12 U.S.C. § 1821(d)(2)(G) (authorizing FDIC to transfer assets and liabilities as a receiver of a failed bank).

"One of FIRREA's core purposes is '[t]o provide funds from public and private sources to deal expeditiously with failed depository institutions.'" *GECCMC*, 671 F.3d at 1035 (citing FIRREA § 101(8)). The FDIC's receivership powers under FIRREA include the ability to transfer or retain any liability of the failed bank as well as to disaffirm or repudiate any lease that the FDIC determines is burdensome. See 12 U.S.C. § 1821(d)(2)(G), (e). FIRREA's statutory scheme thus contemplates the FDIC's sweeping authority to manage the affairs of a failed bank to further the purpose of expeditious resolution of the failed bank's affairs. *See McCarthy v. FDIC*, 348 F.3d 1075, 1079 (9th Cir.2003).

Based on the foregoing authorities, the Court finds the FDIC acted within its authority under FIRREA in transferring certain assets and liabilities to ADC in the Asset Contribution Agreement and retaining certain liabilities. *See* 12 U.S.C. §§ 1821(d)(A)-(B), (G) (The FDIC as Receiver succeeds to "all rights, titles, powers and privileges of" the failed bank, and has power to transfer assets and liabilities through assumption agreements.); *Hilton v. Wash. Mut. Bank*, No. C 09–1191 SI, 2009 WL 3485953, at *2 (N.D. Cal. Oct. 28, 2009).

The receivership gave the FDIC the "power to take all actions necessary to resolve the problems posed by a financial institution in default." *Sahni v. American Diversified Partners*, 83 F.3d 1054, 1058 (9th Cir. 1996). This means that the FDIC has the authority to transfer and, at its discretion, may "transfer any asset or liability of the institution in default ... without any approval, assignment, or consent with respect to such transfer." 12 U.S.C. § 1821(d)(2)(G)(i)(II). The FDIC may also choose not to transfer a liability. *West Park*, 60 F.3d at 1458. In *West Park*, the court concluded that the purpose of the agreement was to "limit [the transferor's] liability for the latent claims of unknown magnitude of shareholders." *Id.* Because the FDIC assumed the obligations of the failed bank and also expressly limited liability when it transferred the failed bank's assets, "any claims ... must be brought against FDIC-receiver and not against [the transferor]." *Id.* So too here, when ANB went into receivership under FIRREA, the FDIC receiver, and not a subsequent purchaser of assets such as ADC, was the successor to ANB's liabilities unless the agreement expressly designates otherwise. *See Payne v. Security Sav. & Loan*

*Assn., F.A.*, 924 F.2d 109, 111 (7th Cir. 1991). This Court finds the FDIC's transfer of assets to ADC was proper.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss (Dkt. 13) is **GRANTED**. This case is HEREBY DISMISSED IN ITS ENTIRETY.

DATED: **May 1, 2013**

Honorable Edward J. Lodge
U. S. District Judge